FILED
2026 Aug-31 PM 02:43
U.S. DISTRICT COURT
N.D. OF ALABAMA

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| DEBT COLLECTIONS, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 2:26-cv-00398-NAD |
| | ) | |
| ALABAMA DENTAL ASSOCIATION, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**
**GRANTING PLAINTIFF'S MOTION TO REMAND**

For the reasons stated below, and on the record in the oral argument motion hearing, the court **GRANTS** the motion to remand filed by Plaintiff Debt Collections, LLC (Doc. 11), and **REMANDS** this case to the Circuit Court for Jefferson County, Alabama. Separately, the court will enter a remand order.

## BACKGROUND

### A. Procedural background

On February 12, 2026, Debt initiated this action against Defendant Alabama Dental Association (ALDA) in Alabama state court. Doc. 1-2. The complaint alleges the following state law causes of action: (1) breach of contract; (2) open account; (3) account stated; (4) money had and received; and (5) unjust enrichment. Doc. 1-2 at 7–11. The complaint arises from an alleged medical benefits stop loss

insurance policy issued to ALDA by Iron Reinsurance Company. Doc. 1-2 at 2–7. Debt filed this action as the assignee of certain rights from Iron. *See* Doc. 1-2 at 2.

On March 10, 2026, ALDA timely removed the case to this court based on federal question jurisdiction. Doc. 1. ALDA asserted that the court has federal question jurisdiction over this case because the Employee Retirement Income Security Act of 1974 (ERISA) completely preempts all of Debt's claims. Doc. 1 at 5–10.

On the same date (March 10, 2026), ALDA also filed a motion for summary judgment asserting collateral estoppel, that there is no genuine dispute of material fact, and that the ERISA statute of limitations bars Debt's claims. Doc. 3; *see* Doc. 6 (evidentiary material); Doc. 7 (supporting brief). On March 13, 2026, the court entered a briefing schedule on ALDA's summary judgment motion. Doc. 8.

On March 25, 2026, Debt filed a motion to stay the briefing on ALDA's summary judgment motion, because Debt intended to file a motion to remand. Doc. 9. On March 26, 2026, ALDA filed its opposition to the stay motion. Doc. 10.

On March 31, 2026, Debt filed this motion to remand (Doc. 11), arguing that the court lacks subject matter jurisdiction over this case because ERISA complete preemption does not apply. *See* Doc. 12 (supporting brief).

On April 1, 2026, the court held a telephone status conference. *See* minute entry, entered: 04/01/2026. Based on the discussion during that conference, the

court stayed the briefing on ALDA's summary judgment motion, stayed all discovery, and set a briefing schedule on Debt's motion to remand. Doc. 13; *see* Doc. 4 (order regarding discovery).

On April 20, 2026, ALDA filed its opposition to this motion to remand. Doc. 16. On May 5, 2026, Debt filed its reply. Doc. 17. The parties consented to magistrate judge jurisdiction. Doc. 14; *see* Doc. 5 (order regarding consent); 28 U.S.C. § 636(c); Fed. R. Civ. P. 73. And, the court held an oral argument hearing on the motion to remand. *See* Doc. 18 (order setting motion hearing); minute entry, entered: 06/25/2026; Doc. 21 (transcript).

**B. Factual background**

The complaint alleges the following: On or about March 26, 2024, Iron assigned to Debt the rights to certain receivables. Doc. 1-2 at 2–3.

ALDA is a professional membership organization of dentists, which at all relevant times sponsored and maintained a self-funded medical benefits plan for its members. Doc. 1-2 at 3.

The plan was administered by Arsenal Health, LLC, which now is bankrupt. Doc. 1-2 at 3.

On or around November 8, 2019, the ALDA Board of Trustees approved the plan. Doc. 1-2 at 6. The trustees "marketed the Plan to ALDA's members and were responsible for fully and accurately conveying the terms of the Plan—including

the terms related to the [medical benefits stop loss insurance] [p]olicy" issued by Iron. Doc. 1-2 at 6.

As stated above, Iron allegedly had issued to ALDA a medical benefits stop loss insurance policy. Doc. 1-2 at 4. "Stop-loss insurance reimburses the plan sponsor for any eligible health care costs that exceed a certain threshold (known as the 'attachment point' or 'specific deductible')." Doc. 1-2 at 4.

The policy term "expired on or around March 31, 2022, and included a 6-month 'runout' period, during which time claims incurred during the Policy term could still be submitted to and covered by Iron." Doc. 1-2 at 4.

Under the policy, "Iron agreed to reimburse ALDA for all eligible claims incurred by a participant in a particular year once that participant's claims exceeded the Specific Deductible of $10,000. Iron paid the claims directly and [sought] reimbursement, rather than first requiring ALDA to pay the claim[s]." Doc. 1-2 at 5.

The policy also included an "Accommodation" clause. Doc. 1-2 at 5. The Accommodation clause "required Iron to temporarily fund incurred health care costs for Plan participants incurred before the Specific Deductible was met if ALDA had not provided enough funding to pay for such claims." Doc. 1-2 at 5. "Said another way, if ALDA had not set aside enough money to pay the claims owed under the Plan, Iron would temporarily pay those claims, too—even for those participants for

whom the Specific Deductible was not yet satisfied." Doc. 1-2 at 5. "For example, assume the Specific Deductible under the [medical benefits stop loss insurance] policy was $10,000. If a participant in the Plan incurred $9,000 of medical claims during a particular Plan year, ALDA was contractually obligated to pay those claims. Pursuant to the Accommodation clause cited above, if ALDA had not set aside sufficient funds to pay these claims, Iron would temporarily pay those claims on ALDA's behalf and then seek repayment from ALDA at a later date." Doc. 1-2 at 5–6. "In the event Iron made such Accommodation Payments, ALDA was contractually responsible for repayment of the Accommodation Payments, as well as any administrative costs associated with the Accommodation Payments." Doc. 1-2 at 6.

The complaint alleges that ALDA now has "refuse[d] to honor the terms" of the medical benefits stop loss insurance policy. Doc. 1-2 at 7. The complaint also alleges that "Iron fully performed its obligation to cover the cost of claims that exceeded the Specific Deductible and does not dispute its responsibility to initially pay such claims," but that at the end of the policy term and runout period ALDA "owed Iron reimbursements for payments made by Iron" pursuant to the policy. Doc. 1-2 at 7.

Along with the complaint, Debt attached a copy of the assignment agreement between Debt and Iron. Doc. 1-2 at 12–16. Debt also attached a copy of the

alleged "Medical Benefits Stop Loss Policy"—apparently for the policy year from September 1, 2018, to August 31, 2019—which was issued by Iron as the insurer to ALDA as the policyholder, and which named Arsenal as the "Designated Plan Supervisor (or TPA)." Doc. 1-2 at 37.

The policy is designated "non-participating insurance," and states, "This is a reimbursement policy. You [ALDA], or Your Plan Supervisor [Arsenal], are responsible for making benefit determinations under Your Employment Benefit Plan. We [Iron] have no duty, obligation, or authority to administer, settle, adjust, or provide advice regarding claims filed under Your Employee Benefit Plan." Doc. 1-2 at 38 (bold all-caps emphasis omitted). The policy defines "Employee Benefit Plan" as the "medical benefits You [ALDA] have agreed to provide under a plan of benefits for Your Eligible employees and their Eligible dependents, whether or not it is subject to [ERISA]." Doc. 1-2 at 41 (all-caps emphasis omitted).

The policy states: "We [Iron] have no duty or obligation to settle or adjust any claims for Plan Benefits filed under Your [ALDA's] Employee Benefit Plan." Doc. 1-2 at 46. The policy also states: "This Policy is between You [ALDA] and Us [Iron]. No other party has any rights under this Policy." Doc. 1-2 at 47. The policy states further: "You [ALDA] or Your Plan Supervisor [Arsenal] is responsible for administering Your Employee Benefit Plan, preparing reports as required by Us [Iron] and keeping and making available to Us such data as We may

require." Doc. 1-2 at 54.

The policy also includes a "disclaimer": "We [Iron] act only as an insurer to You [ALDA]. We are not a fiduciary or a party in interest to the Employee Benefit Plan or any participant. We do not assume any duty to perform any of the functions of, or to provide any of the reports required by, You by [ERISA] or any other applicable state or federal law. We assume no responsibility or obligation for the administration of Your Employee Benefit Plan or Your acts. We reserve the right to determine amounts payable under this Policy without regards to such acts." Doc. 1-2 at 50 (all-caps emphasis omitted).

The policy states that "[t]he form of coverage is specific stop loss insurance." Doc. 1-2 at 40 ("contract basis"; all-caps emphasis omitted). The policy also states that the "Specific Deductible is Ten Thousand Dollars ($10,000). This is the amount of Covered Expenses that must be Paid by the Employee Benefit Plan for a Covered Person before Specific Stop Loss Insurance benefits are reimbursable under the Policy." Doc. 1-2 at 44 ("specific deductible"; all-caps emphasis omitted). The policy states further, "We [Iron] will reimburse You [ALDA] for Specific Stop Loss Insurance, subject to the terms, conditions, and limitations of this Policy, only after We receive a written request for reimbursement with complete claim information." Doc. 1-2 at 45; *see also* Doc. 1-2 at 44 ("We will reimburse You for Covered Expenses Paid in excess of the Specific Deductible." ("specific stop loss

insurance"; bold all-caps emphasis omitted).

The "Accommodation" clause in the policy[1] states as follows:

> Accommodation shall be provided for only those claims for which reimbursement is provided under the terms of the Agreement. The Insurer shall determine for each Contract Month whether the cumulative total of claims paid to date by the Company exceeds the Company's required contributions as determined by the Company's Plan Administrator. The total amount of Accommodation made under this Agreement shall never be more than the amount by which such claims Paid during the Contract Period exceeds the Insurer's net retained liability attributable to the Contract Basis under this Agreement. Accommodations shall be repaid to the Insurer each month as the Company's required contributions exceed its claims paid plus expenses.

Doc. 1-2 at 54; *see also* Doc. 1-2 at 5 (same).

## LEGAL STANDARD

### A. Federal subject matter jurisdiction

Federal courts have a "strict duty to exercise the jurisdiction that is conferred upon them by Congress." *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 716 (1996); *accord Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976) (federal courts have a "virtually unflagging obligation . . . to exercise the jurisdiction given them"). However, "[f]ederal courts are courts of limited jurisdiction." *Burns v. Windsor Ins. Co.*, 31 F.3d 1092, 1095 (11th Cir.

[1] As part of the evidentiary materials that ALDA submitted in support of its summary judgment motion, ALDA included an apparent version of the alleged policy that did not include any Accommodation clause at all. Doc. 6-10 at 8–27.

1994). Generally speaking, federal subject matter jurisdiction over a civil case requires either a question "arising under the Constitution, laws, or treaties of the United States" (28 U.S.C. § 1331), or complete diversity of citizenship (28 U.S.C. § 1332).

On a motion to remand for lack of jurisdiction, "the removing party bears the burden of showing the existence of federal subject matter jurisdiction." *Connecticut State Dental Assn. v. Anthem Health Plans, Inc.*, 591 F.3d 1337, 1343 (11th Cir. 2009). "'As a general rule, a case arises under federal law only if it is federal law that creates the cause of action.'" *Id.* (quoting *Diaz v. Sheppard*, 85 F.3d 1502, 1505 (11th Cir. 1996)). Normally, the test for federal question jurisdiction is "whether a federal question appears on the face of the plaintiff's well-pleaded complaint." *Id.*

**B. ERISA complete preemption**

ERISA "[c]omplete preemption is a narrow exception to the well-pleaded complaint rule." *Connecticut State Dental*, 591 F.3d at 1343. "ERISA is one of only a few federal statutes under which two types of preemption may arise: conflict preemption and complete preemption." *Id.* Conflict preemption (or defensive preemption) preempts any state law claim that "relates to" an ERISA plan, but "conflict preemption is merely a defense, it is not a basis for removal." *Id.* at 1344.

On the other hand, complete preemption (or superpreemption) arises from

ERISA's civil enforcement provision, § 502(a), which is codified at 29 U.S.C. § 1132(a); complete preemption "converts an ordinary state common law complaint into one stating a federal claim for purposes of the well-pleaded complaint rule," and consequently provides a basis for removal to federal court. *Connecticut State Dental*, 591 F.3d at 1344.

On this motion to remand, the parties agree that the controlling test for ERISA complete preemption (and removability) is the four-part test "set forth in *Butero v. Royal Maccabees Life Insurance Co.*, 174 F.3d 1207 (11th Cir.1999): (1) 'there must be a relevant ERISA plan,' (2) 'the plaintiff must have standing to sue under that plan,' (3) 'the defendant must be an ERISA entity,' and (4) 'the complaint must seek compensatory relief akin to that available under § [502(a)]; often this will be a claim for benefits due under a plan.'" *Connecticut State Dental*, 591 F.3d at 1344 (quoting *Butero*, 174 F.3d at 1212); *see* 29 U.S.C. § 1132(a); Doc. 21 at 37–38; Doc. 1 at 7; Doc. 12 at 10–13; Doc. 16 at 11–14.

The *Butero* test is rooted in ERISA § 502(a), *see* 29 U.S.C. § 1132(a). *Butero*, 174 F.3d at 1212 ("ERISA superpreemption exists only when the 'plaintiff is seeking relief that is available under 29 U.S.C. § 1132(a).'" (quoting *Whitt v. Sherman Int'l Corp.*, 147 F.3d 1325, 1330 (11th Cir. 1998)); *see Connecticut State Dental*, 591 F.3d at 1343.

Section 1132(a) provides in relevant part that a civil action "may be brought

. . . by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan." 29 U.S.C. § 1132(a)(3).

On this motion to remand, the parties also agree that the dispositive issue is whether Debt, as assignee of Iron, has standing to sue under ERISA—that is, specifically, whether Iron was an ERISA fiduciary. *See* Doc. 21 at 30, 38, 42; Doc. 16 at 8.

By statute, "a person is a fiduciary with respect to the plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan." 29 U.S.C. § 1002(21)(A); *accord Cotton v. Massachusetts Mut. Life Ins. Co.*, 402 F.3d 1267, 1277 (11th Cir. 2005).

"Clearly, the fiduciary duties outlined in ERISA are designed to protect the plan and its beneficiaries rather than those who administer the plan." *First Nat. Life Ins. Co. v. Sunshine-Jr. Food Stores, Inc.*, 960 F.2d 1546, 1550 (11th Cir. 1992).

That is because "ERISA is a comprehensive statute designed to promote the interests of employees and their beneficiaries in employee benefit plans." *Ingersoll-Rand Co. v. McClendon*, 498 U.S. 133, 137 (1990) (quoting *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 90 (1983)).

In addition, "fiduciary status under ERISA is not an all-or-nothing concept, and a court must ask whether a person is a fiduciary with respect to the particular activity at issue." *Cotton*, 402 F.3d at 1277 (citation and quotation marks omitted). "In other words, 'ERISA . . . defines "fiduciary" not in terms of formal trusteeship, but in *functional* terms of control and authority over the plan.'" *Romano v. John Hancock Life Ins. Co. (USA)*, 120 F.4th 729, 739 (11th Cir. 2024) (quoting *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 262 (1993)) (emphasis in original).

In this regard, the performance of "ministerial [insurance-]policy-related services"—for instance, "allocating [employees'] premium payments between the portion counted as loans from their employer and the portion treated as income to them, analyzing policy performance, and communicating with [employees] regarding policy performance"—does not "render an insurer . . . a fiduciary if it does not otherwise occupy that status." *Cotton*, 402 F.3d at 1279 (citations omitted). "Nor does the performance of multiple duties, none of which in and of itself creates fiduciary status, render one a fiduciary." *Id.* (citation omitted).

## DISCUSSION

Based on the controlling law, the allegations in the complaint, and the record evidence, the court must remand this case to the Alabama state trial court. ALDA has not carried its burden of showing ERISA complete preemption and removability. *See Connecticut State Dental*, 591 F.3d at 1343.

As explained above, the determinative issue is whether Iron was an ERISA fiduciary, such that Debt—as assignee of Iron—has the standing that is required for complete preemption under *Butero* and § 502(a)(3). *See Butero*, 174 F.3d at 1212; 29 U.S.C. § 1132(a)(3); Legal Standard *supra*.

### I. There is no caselaw concluding that a stop-loss reinsurer is an ERISA fiduciary.

As a preliminary matter, there is no caselaw concluding that an alleged stop-loss reinsurer—like Iron here—is an ERISA fiduciary. Neither ALDA nor this court has identified any such case. Everyone agrees that Iron was neither a participant, a beneficiary, nor a sponsor of a benefits plan, and that Debt's state law causes of action do not actually reach the substance of the benefits plan, any claim for benefits under that plan, or any of the plan beneficiaries at all.

In situations like this, courts generally have ruled that an insurer providing stop loss reinsurance falls outside the scope of ERISA and is not treated as a fiduciary. *See, e.g.*, *Strategic Outsourcing, Inc. v. Commerce Benefits Grp. Agency, Inc.*, 54 F. Supp. 2d 566, 573 (W.D.N.C. 1999) (collecting cases and reasoning that

"[r]einsurance coverage does not provide insurance benefits for the plan participants but instead is in the nature of excess liability coverage for the employer and, as such, falls outside the scope of both the plan and ERISA").

Indeed, "[a]n apparently unbroken line of decisions concludes that excess loss or reinsurance proceeds that are not payable to persons covered by a plan are outside the scope of ERISA." *Baker County Med. Servs., Inc. v. Fringe Benefits Mgmt. Co.*, No. 4:04-CV-488-RHWCS, 2005 WL 2001734, at *3 (N.D. Fla. Aug. 12, 2005) (collecting cases).

Consistent with that unbroken line of caselaw, the Middle District of Alabama has reasoned that ERISA "is not directly concerned with regulating a plan insurer's collateral business transactions," and consequently that ERISA "was not intended to displace commonplace, run-of-the-mill state-law claims that might arise out of such transactions." *Consumer Benefits Assn. of U.S. v. Lexington Ins. Co.*, 731 F. Supp. 1510, 1516 (M.D. Ala. 1990).

## II. ALDA has not carried its burden to show that Iron was an ERISA fiduciary.

Nevertheless, ALDA argues that this case is different—and that the rule of thumb discussed above should not apply, *see supra* Part I—primarily because of the "Accommodation" clause in the medical benefits stop loss insurance policy that Iron allegedly issued to ALDA. In particular, ALDA agues that, "[f]or the ALDA Plan, Iron was an ERISA fiduciary on three grounds: (A) The Accommodation clause of

the Iron insurance policy, (B) Iron's making discretionary decisions about funding or not funding ALDA Plan Accommodation payments, or (C) Iron's having and using information central to administering and managing the ALDA Plan, yet not disclosing the information to ALDA or to ALDA Plan participants." Doc. 16 at 8; *see* Doc. 21 at 42 (similar).

First, ALDA has not shown that the plain text of the "Accommodation" clause gave Iron discretion over ALDA's self-funded medical benefits plan or the plan assets. *See* Doc. 16 at 1–2; Doc. 21 at 3, 42. Everyone agrees that the Accommodation clause, as written, is unclear. But, whatever else the Accommodation clause may say, the plain language of the clause and the policy does make clear that Iron's accommodation payments to ALDA would be limited to reimbursement for specific stop loss insurance coverage. For example, the Accommodation clause says "Accommodation shall be provided for only those claims for which reimbursement is provided under the terms of the Agreement," and limits the "total amount of Accommodation made under this Agreement" according to "the Contract Basis under this Agreement." Doc. 1-2 at 54. As explained above, the policy elsewhere defines the "Contract Basis" as "[t]he form of coverage is specific stop loss insurance. The Contract Basis shall be considered in determining what Covered Expenses will be reimbursed by Us." Doc. 1-2 at 40. The policy also states that "[t]his is a reimbursement policy." Doc. 1-2 at 38. With

respect to the specific stop loss insurance coverage, the policy states further that the "Specific Deductible is Ten Thousand Dollars ($10,000)," that "[t]his is the amount of Covered Expenses that must be Paid by the Employee Benefit Plan for a Covered Person before Specific Stop Loss Insurance benefits are reimbursable under the Policy," and that "We will reimburse You for Covered Expenses Paid in excess of the Specific Deductible." Doc. 1-2 at 44.

The Accommodation clause also says that ALDA shall repay Iron for accommodation payments: "Accommodations shall be repaid to [Iron]." Doc. 1-2 at 54.

Moreover, the policy expressly states that "Iron [is] *not a fiduciary* or a party in interest to the Employee Benefit Plan or any participant." Doc. 1-2 at 50 (emphasis added). Among other things, the policy states that Iron "do[es] not assume any duty to perform any of the functions of, or to provide any of the reports required by, [ALDA] by [ERISA] or any other applicable state or federal law," that Iron "assume[s] no responsibility or obligation for the administration of [ALDA's] Employee Benefit Plan or [ALDA's] acts," and that Iron "act[s] only as an insurer to [ALDA]." Doc. 1-2 at 50. The policy also states that "[ALDA], or [Arsenal], are responsible for making benefit determinations under [ALDA's] Employment Benefit Plan" (Doc. 1-2 at 38), that Iron "ha[s] no duty, obligation, or authority to administer, settle, adjust, or provide advice regarding claims filed under [ALDA's]

Employee Benefit Plan" (Doc. 1-2 at 38), that Iron "ha[s] no duty or obligation to settle or adjust any claims for Plan Benefits filed under [ALDA's] Employee Benefit Plan" (Doc. 1-2 at 46), and that "[ALDA] or [Arsenal] is responsible for administering [ALDA's] Employee Benefit Plan." Doc. 1-2 at 54.

Thus, nothing in the plain text of the Accommodation clause or the medical benefits stop loss insurance policy otherwise shows that Iron had any discretionary authority, responsibility, or control over ALDA's plan or the self-funded plan assets. *See* 29 U.S.C. § 1002(21)(A); *Butero*, 174 F.3d at 1212; 29 U.S.C. § 1132(a)(3).

Next, ALDA has not shown that Iron's funding of any accommodation payments—as alleged in the complaint—made Iron an ERISA fiduciary. *See* Doc. 16 at 3; Doc 21 at 22, 25. While ALDA is correct that the allegations in the complaint about the funding of accommodation payments do appear to vary from the plain language of the Accommodation clause and the medical benefits stop loss insurance policy, those allegations still do not show that Iron had any discretion over the plan or the plan assets. As explained above, the complaint does not limit accommodation payments to specific stop loss insurance coverage for covered expenses exceeding the Specific Deductible.

Rather, the complaint alleges that the Accommodation clause "required Iron to temporarily fund incurred health care costs for Plan participants incurred *before* the Specific Deductible was met if ALDA had not provided enough funding to pay

for such claims," and that, "if ALDA had not set aside enough money to pay the claims owed under the Plan, Iron would temporarily pay those claims, too—even for those participants for whom the Specific Deductible was *not* yet satisfied." Doc. 1-2 at 5 (emphasis added). The complaint also alleges a hypothetical "example": "[A]ssume the Specific Deductible under the [medical benefits stop loss insurance] policy was $10,000. If a participant in the Plan incurred $9,000 of medical claims during a particular Plan year, ALDA was contractually obligated to pay those claims." Doc. 1-2 at 5. Even though the Specific Deductible would *not* have been met for that plan participant, "[p]ursuant to the Accommodation clause cited above, if ALDA had not set aside sufficient funds to pay these claims, Iron would temporarily pay those claims on ALDA's behalf and then seek repayment from ALDA at a later date." Doc. 1-2 at 5–6.

ALDA argues that, as alleged, Iron had discretion regarding whether or not to fund accommodation payments—i.e., before the Specific Deductible had been met for any given plan participant. *See, e.g.*, Doc. 16 at 8; Doc. 21 at 42. But, even as alleged, Iron was not an ERISA fiduciary. ALDA still sponsored the plan, and Arsenal still administered the plan.

Consistent with the Accommodation clause and the medical benefits stop loss insurance policy generally, the allegations in the complaint make clear that ALDA still was responsible for payment of medical claims for each participant before the

Specific Deductible had been met, even where Iron allegedly had made accommodation payments: "ALDA was contractually obligated to pay those claims." Doc. 1-2 at 5. Iron would fund those claims only "temporarily" on "ALDA's behalf" (Doc. 1-2 at 5–6), and then "seek repayment from ALDA at a later date" (Doc. 1-2 at 6). "ALDA was contractually responsible for repayment of th[ose] Accommodation Payments, as well as any administrative costs associated with th[ose] Accommodation Payments." Doc. 1-2 at 6.

Likewise, there is no allegation that Iron was involved at all in managing medical claims or benefits for plan participants, disbursing payments under the plan to medical providers, or investing plan assets. Iron only provided specific stop loss insurance and, as alleged, temporarily funded payments for some medical claims before the Specific Deductible had been met for a given plan participant—i.e., medical claims which ALDA was contractually obligated to pay, and for which ALDA was contractually obligated to repay Iron.

At the oral argument motion hearing, counsel suggested that Iron purportedly had deposited any such accommodation payments into a checking account that Arsenal—the plan administrator—had opened and operated on ALDA's behalf, although apparently without ALDA's knowledge. *See, e.g.*, Doc. 21 at 17. ALDA argues that Iron had discretion over plan administration and plan assets, because Iron—in its own discretion and without ALDA's knowledge—allegedly was

depositing money into the Arsenal-operated, ALDA checking account, from which payments under the plan were funded, at least temporarily. Doc. 21 at 18–21, 26–28.

Without more, Iron's allegedly having deposited money—pursuant to the Accommodation clause—into the plan's checking account in order to temporarily fund payments under the plan, which ALDA remained contractually obligated to pay (and repay), did not give Iron any discretionary authority or control over the plan or its assets. *See Cotton*, 402 F.3d at 1277; Doc. 21 at 4, 21. Again, Iron did not manage claims or benefits, make any payments from out of the plan's checking account, or invest any of the money in the plan's checking account; that still would have been Arsenal on ALDA's behalf. Instead, the alleged accommodation payments into the plan's checking account amount to payments under a contractual, third-party financing agreement (i.e., before the Specific Deductible had been met for a given plan participant). As such, depositing money into the plan's checking account was only a "ministerial [insurance-]policy-related service[]" that did not "render" Iron a fiduciary. *See Cotton*, 402 F.3d at 1279.

Any alleged discretion that Iron exercised regarding depositing money into the plan's checking account was only with respect to whether to provide funding pursuant to the Accommodation clause in the medical benefits stop loss insurance policy, and not discretion regarding the administration of the plan or its assets.

Regardless of how much money Iron deposited into the plan's checking account (and when), as allegedly determined by Iron according to its interpretation of the Accommodation clause, it still was for Arsenal to administer the money in that checking account; and it still was ALDA that was contractually obligated both to pay the claims under its self-funded medical benefits plan (with the money in that checking account or otherwise), and to repay Iron for any accommodation payments.

Finally, ALDA has not shown that Iron had a fiduciary duty to provide any information to ALDA or the plan beneficiaries. ALDA argues that, because ALDA did not know about the alleged Iron medical benefits stop loss insurance policy (or the Accommodation clause) until June 2022, Iron had information that Iron was required to provide to ALDA. Doc. 16 at 3; Doc. 21 at 8, 12–14, 41. But there was no such obligation on Iron, much less any such obligation that would render Iron an ERISA fiduciary in this case.

As explained above, the complaint alleges that the ALDA trustees "were responsible for fully and accurately conveying the terms of the Plan—including the terms related to the [medical benefits stop loss insurance] [p]olicy" issued by Iron, as well as "the members' potential exposure for costs and expenses associated with the Plan, and the members' obligations to Iron." Doc. 1-2 at 6. That is an alleged information-sharing obligation on ALDA. However, ALDA argues that, because Iron allegedly was the only entity with information about how much money Iron was

depositing—pursuant to the Accommodation clause—into the Arsenal-operated, ALDA checking account, Iron was a fiduciary with respect to the plan. Doc. 21 at 41.

But, consistent with both the Accommodation clause and the allegations in the complaint, the plan administrator—Arsenal—would have had that same information regarding money in the ALDA checking account. *See* Doc. 1-2 at 3 ("The Plan purchased by ALDA was self-funded. . . . ALDA's Plan was administered by the now-bankrupt [Arsenal]."). So, while it is undisputed that the ALDA trustees—and seemingly Arsenal—had a fiduciary duty to provide information to plan beneficiaries, there is no showing that Iron had that obligation, based on the Accommodation clause or otherwise. *See First Nat. Life*, 960 F.2d at 1550 ("[T]he fiduciary duties outlined in ERISA are designed to protect the plan and its beneficiaries rather than those who administer the plan.").

That conclusion is confirmed by the controlling law that "fiduciary status under ERISA" is contextual, depending on "the particular activity at issue," and not "an all-or-nothing concept." *See Cotton*, 402 F.3d at 1277.

Section 1002(21)(A) renders an entity a "fiduciary" only "to the extent" that the entity "was acting as a fiduciary (that is, was performing a fiduciary function) when taking the action subject to complaint." *Pegram v. Herdrich*, 530 U.S. 211, 226 (2000). "ERISA federalized a great portion of the law governing employee

benefit plans. It is *not* true, however, that all contracts relating in any way to an ERISA plan are governed entirely by ERISA." *Baker County*, 2005 WL 2001734, at *2 (emphasis in original).

In this case, Debt—as the plaintiff, and assignee of Iron—filed its complaint to collect money that ALDA allegedly owes under the Accommodation clause of the Iron medical benefits stop loss insurance policy. While ALDA may prevail on Debt's state law causes of action based on ALDA's position that ALDA did not know about the alleged Iron medical benefits stop loss insurance policy or the Accommodation clause until June 2022, "the action subject to complaint" is Iron's alleged accommodation payments and ALDA's alleged "refus[al] to honor the terms" of the policy and to repay those accommodation payments (Doc. 1-2 at 7). *See Pegram*, 530 U.S. at 226. Thus, on the question whether Iron was an ERISA fiduciary, "the particular activity at issue" is the alleged accommodation payments, and not any alleged information sharing by the ALDA trustees, Arsenal, or Iron. *See Cotton*, 402 F.3d at 1277.

## CONCLUSION

For the reasons stated above, Debt's motion to remand (Doc. 11) is **GRANTED**, and this case is **REMANDED**. The court **DIRECTS** the Clerk of Court to **REMAND** this case to the Circuit Court for Jefferson County, Alabama.

The court will enter a separate remand order.

**DONE** and **ORDERED** this August 31, 2026.

**NICHOLAS A. DANELLA**
UNITED STATES MAGISTRATE JUDGE